**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Cedric Barberet and Estelle Barberet<br><br>      Debtors. | Chapter 7<br><br>Case No. 25-14833 (PMM) |
| The Orsini Group, LLC, Benjamin T. Frank, and Amalfi Properties LP,<br><br>      Plaintiffs,<br>v.<br><br>Cedric Barberet and Estelle Barberet<br><br>      Defendants. | Adv. Pro. No. |

**COMPLAINT OF THE ORSINI GROUP, LLC, BENJAMIN T. FRANK, AND AMALFI PROPERTIES LP FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(A)(2), (4), AND (6), AND OBJECTION TO DISCHARGE PURSUANT TO 11 <u>U.S.C. § 727(A)(3) AND (4)(A)</u>**

Plaintiffs The Orsini Group, LLC (the "Company" or "Orsini"), Benjamin T. Frank, and Amalfi Properties LP ("Amalfi") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file their Complaint for Determination of Non-Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2), (4), and (6), and Objection to Discharge pursuant to 11 U.S.C. § 727(a)(3) and (4)(A), and assert as follows:

<u>**INTRODUCTION**</u>

1.     Cedric Barberet ("Cedric") and his wife Estelle Barberet ("Estelle") embezzled hundreds of thousands of dollars from Plaintiffs, tried to cover their tracks by falsifying records and deleting documents, and then sought cover in the bankruptcy system. Once there, they filed

financial disclosures that failed to account for the money they had embezzled, and claimed insolvency despite the vast sums of cash they had misappropriated.

2.       The law does not permit the bankruptcy discharged to be misused in that way. Debts obtained by fraud, embezzlement, and deliberate misconduct are not dischargeable. Nor is a debtor eligible for a discharge once having falsified, destroyed, or failed to keep financial records, or having fraudulently made a false account of assets or income. For these reasons, Debtors are not entitled of a discharge of their debts to Plaintiffs.

3.       Cedric, a French pastry chef, and his wife Estelle were engaged by Plaintiffs to oversee a Bistro and Bakery more than a decade ago.

4.       Unfortunately, Cedric and Estelle used the Bistro and Bakery as their personal piggy bank, misappropriating its funds for a wide range of endeavors. Cedric wrote himself and Estelle dozens of unauthorized checks from Orsini's bank account, used the company credit card to for personal items, and personally accepted luxury goods in lieu of payment to the Bistro and Bakery—concealing this from Plaintiffs

5.       Cedric and Estelle's misconduct culminated with their using Bistro and Bakery resources—including staff and supplies—to start a competing bakery stand just blocks away from the Bistro and Bakery, selling identical items, and funneling those proceeds into their own pockets.

6.       Cedric routinely falsified Bistro and Bakery records to conceal his theft, even instructing the Bistro and Bakery's bookkeeper to prepare fabricated profit and loss statements.

7.       Once their scheme came to light, Cedric deleted emails and changed passwords in an effort thwart Bistro and Bakery operations. Estelle also deleted her emails.

LEGAL\113856856\3

8. After initially closing their bakery stand following Cedric's expulsion, Cedric and Estelle soon reopened it, fully funded and stocked with money, equipment, and supplies they took, without permission, from the Bistro and Bakery.

9. Hundreds of thousands of dollars remain unaccounted for or are otherwise missing. Cedric and Estelle's bankruptcy filings fail to explain the money's disappearance, and Cedric's falsification of Bistro and Bakery records makes tracking it down even more difficult.

10. When Plaintiffs tried to uncover the full extent of Cedric and Estelle's theft through a lawsuit in the Lancaster County Court of Common Pleas, Cedric and Estelle sought to avoid accountability in bankruptcy.

11. But debts obtained through fraud, theft, embezzlement, and deliberate wrongdoing are not dischargeable. Nor may a debtor obtain a discharge after destroying and falsifying financial records. Plaintiffs therefore bring this adversary proceeding to seek a declaration of non-dischargeability.

## **PARTIES**

12. Plaintiff The Orsini Group, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania that maintains its registered office at 26 East King Street, Lancaster, Pennsylvania 17602.

13. Plaintiff Benjamin T. Frank is an individual who resides at 107 Creekgate Court, Millersville, Pennsylvania 17551 and Member and Manager of Orsini.

14. Plaintiff Amalfi Properties LP is a limited partnership organized under the laws of the Commonwealth of Pennsylvania that maintains its registered office at 26 East King Street, Lancaster, Pennsylvania 17602.

3

15.     Defendant Cedric Barberet is an individual who resides 517 Prince George Dr. Lancaster, Pennsylvania 17601.

16.     Defendant Estelle Barberet is an individual who resides 517 Prince George Dr. Lancaster, Pennsylvania 17601.

17.     Defendants Cedric Barberet and Estelle Barberet are the Debtors in this Chapter 7 Bankruptcy proceedings.

## JURISDICTION AND VENUE

18.     This is an adversary proceeding to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(2), (4), and (6), and to object to a discharge under 11 U.S.C. § 727(a)(3) and (4)(A).

19.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

20.     Venue is proper in this Court as provided in 28 U.S.C. §§ 1408 and 1409.

21.     This cause of action constitutes a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I) and (J).

## FACTS

A.      **Plaintiffs' and Cedric's Agreement to Open the Bistro and Bakery**

22.     In 2014, Plaintiffs agreed to provide Cedric capital and space in their Lancaster property to start the Bistro and Bakery Business. Cedric could not afford a capital contribution. To that end, Amalfi loaned Cedric his capital contribution. Plaintiffs obtained an additional loan to help Cedric establish the Bistro and Bakery.

23.     On April 1, 2014, Plaintiffs and Cedric executed the Operating Agreement of The Orsini Group, LLC (the "Operating Agreement") to govern the affairs of Orsini and the rights and obligations of members of Orsini. Orsini did business as the Bistro and Bakery under a fictitious name.

4

24.    Orsini is a manager-managed LLC. The Operating Agreement appointed Plaintiff Benjamin T. Frank and two of Mr. Frank's family members as Orsini's Managers (the "Managers"). *See* Operating Agreement § 6.2(a); *see also id.*, Art. 1 (definition of "Initial Members").

25.    The Franks received 100% of the Class F Member Units in Orsini (the "Class F Members"). Class F Members were entitled to vote on all matters presented to members of Orsini for approval. See id., Art. 1 (definition of "Class F Units").

26.    Cedric and Amalfi became Class B Members in Orsini (the "Class B Members"). Under the Operating Agreement, Class B Members had no voting rights "unless the right to vote is expressly granted by the Managers." *Id.*, Art. 1 (definition of "Class B Units"). The Class F Members and Class B Members are collectively referred to as the "Members."

The Operating Agreement delegated Cedric "general, day-to-day management and supervisory control of the operation of the Bistro and Bakery." *Id.*, Art. 1 (definition of "Membership Interest"). As a practical matter, Cedric operated the Bistro and Bakery and took responsibility for its affairs, including, but not limited to, overseeing service and sales, managing staff, maintaining books and records, paying expenses, and managing payroll.  Cedric promised he would not compete directly with Plaintiffs.  Operating Agreement § 11.2(a).

27.    Estelle was hired as a manager of the Bakery.

28.    Cedric also owed fiduciary duties to Orsini, the Managers, and the Members. Specifically, Cedric "agree[d] to (and to the extent relevant, to cause Estelle Barbaret) to devote his and her best efforts and full-time business attention to the development, operation and success of the Bistro Business and the Bakery solely for the benefit of the Company and the Members." Operating Agreement, § 6.7(a).

LEGAL\113856856\3

29. In exchange for their undivided loyalty, time, and commitment to the Bistro and Bakery, Cedric and Estelle each received a monthly salary of $6,250 through 2015 and at minimum $4,500 per month after that. *See* Operating Agreement, Schedule 3.1, § II(A). After 2015, the Operating Agreement required Cedric to seek the Managers' approval for any increase to his or Estelle's salary. *Id.*

30. Amalfi was entitled to a guaranteed distribution of a percentage of the Bistro and Bakery's gross profits. *See* Operating Agreement, Schedule 3.1, §IV.

31. Amalfi's loan to Cedric was also secured by Cedric's membership interest. *Id.* § VI(C).

**B.** **Cedric's Financial Misappropriation, Falsifying of Bistro and Bakery Books and Records, and Theft of Bistro and Bakery Resources to Establish His Bakery Stand**

1. Cedric's Financial Misconduct

32. Cedric used Bistro and Bakery cash and accounts that he controlled as a personal slush fund, transferring thousands of dollars to himself and Estelle for numerous personal business ventures, personal travel, and luxury goods. In other instances, Cedric would personally accept luxury goods in lieu of payment to the Bistro and Bakery. When Plaintiffs confronted Cedric about this financial impropriety, Cedric offered baseless excuses that in no way justified his misappropriation of Bistro and Bakery funds.

a. Cedric's Theft of the Bistro and Bakery's Cash Sales

33. Beginning in 2019, Cedric began diverting significant amounts of cash received from Bistro and Bakery sales into his own pocket. Cedric used these funds, which belonged to the Bistro and Bakery, to fund his lifestyle and personal business ventures.

34. The Bistro and Bakery does hundreds of thousands of dollars in cash sales per year. Since 2019, however, the amount of cash deposited into the Bistro and Bakery's accounts has

6

LEGAL\113856856\3

paled in comparison to the volume of the Bistro and Bakery's cash transactions. For example, in 2024, the Bistro and Bakery conducted more than $150,000 in cash sales, yet $4,100 in cash was deposited into the Bistro and Bakery's accounts. In 2022, no cash was deposited into the Bistro and Bakery's accounts, despite the Bistro and Bakery conducting nearly $200,000 in cash sales. Zero cash has been deposited into the Bistro and Bakery's accounts from cash sales in 2025.

35. Upon information and belief, rather than deposit cash from Bistro and Bakery sales into Bistro and Bakery accounts, Cedric stole the cash for himself, treating the Bistro and Bakery like his personal piggy bank.

36. Upon information and belief, Cedric has misappropriated in excess of $200,000 in cash from the Bistro and Bakery.

b. Cedric's Unauthorized Checks from the Bistro and Bakery to Himself and Estelle

37. Beginning in or around 2016, Cedric began writing checks from Orsini's bank account to himself and Estelle in small increments separate and apart from any income, benefits, or remuneration he and Estelle were owed by Orsini.

38. Cedric issued himself and cashed at least 300 checks in $500 increments and numerous other checks in amounts ranging from $250 to $2,000.

39. For example, Cedric wrote himself $500 checks on January 28, February 18, and February 28, 2025. None of those checks were authorized as payment for Cedric's salary or distributions from the business.

40. Cedric also wrote dozens of $500 checks from Orsini's bank account to Estelle that she cashed.

LEGAL\113856856\3

41.    For example, on January 22 and 28, 2025, Estelle cashed checks for $500 from Orsini's bank account, signed by Cedric. Neither of those checks were authorized as payment for Estelle's salary.

42.    When confronted about this practice, Cedric claimed that the checks were so he could replenish petty cash paid to employees as cash tips. But Bistro and Bakery employees do not receive cash tips. Bistro and Bakery employees receive tips in their paychecks paid from the Bistro and Bakery's accounts.

43.    Cedric has never maintained proper records for the Bistro and Bakery's cash funds and tips despite repeated demands that he do so.

44.    Cedric also claimed that these checks were to fund his retirement account. The Operating Agreement does not provide for funding of Cedric's retirement accounts.

45.    Upon information and belief, Cedric pocketed the money from the Orsini's checks to use for personal purposes and to fund personal business ventures.

c.    <u>Cedric Paying His Personal Legal Bills with Bistro and Bakery Funds</u>

46.    Cedric used Bistro and Bakery funds to pay bills for legal services rendered personally to him but concealed that from Plaintiffs.

47.    Under Section 10.5 of the Operating Agreement, "[t]he Company's accountants, auditors, bookkeepers, and legal counsel . . . shall be the individuals and firms selected by the Initial Members." Operating Agreement, § 10.5. The "Initial Members" are the Class F Members. *See* Operating Agreement, Art. I (definition of "Initial Members"); *id.* (definition of "Class F Members").

48.    Cedric did not seek or obtain the permission of the Class F Members to use Bistro and Bakery funds to pay for legal services rendered to him.

LEGAL\113856856\3

49.     Cedric used Bistro and Bakery funds to pay for thousands of dollars in legal services rendered to him regarding his personal business ventures, including, but not limited to, his bakery stand.

### d.     Cedric Using Orsini's Credit Card for Personal Purchases

50.     Cedric also used Orsini's credit card for personal purchases for himself and Estelle, which he hid from Plaintiffs.

51.     On July 29, 2023, Cedric used Orsini's credit card to purchase airline tickets to Cancún, Mexico.

52.     In August 2023, Cedric used Orsini's credit card for multiple purchases in Mexico.

53.     On March 28, 2024, Cedric used Orsini's credit card to purchase airline tickets to Paris.

54.     On April 18, 2024, Cedric used Orsini's credit card to purchase airline tickets to Las Vegas.

55.     On May 16, 2024, Cedric used Orsini's credit card to purchase a hotel room in New York City for $687.36.

56.     On June 24, 2024, Cedric used Orsini's credit card at Gucci Las Vegas, spending $433.50.

57.     On September 14 and 15, and October 7, 2024, Cedric used Orsini's credit card to spend hundreds of dollars for hotel rooms.

58.     On information and belief, Cedric's purchases of restaurant supplies with the Bistro and Bakery credit card included supplies for his and Estelle's competing bakery stand.

59.     None of the foregoing purchases were for authorized business purposes.

60.     Cedric had no right to use Orsini's credit card for personal items.

LEGAL\113856856\3

2.      Cedric's Falsification of Bistro and Bakery Books and Records

61.     Cedric tried to keep Plaintiffs in the dark about his movements of money out of the Bistro and Bakery and hide his misappropriation of Bistro and Bakery funds.

62.     Cedric routinely failed to maintain the Bistro and Bakery's books and records, including by failing to prepare regular, accurate financial statements.

63.     Since in or around January 2024, Cedric failed to prepare bank reconciliation statements comparing the Bistro and Bakery's internal cash records with bank statements.

64.     Cedric evaded preparing bank reconciliation statements knowing that doing so would reveal he had funneled significant amounts of money out of the Bistro and Bakery into his own pocket.

65.     Plaintiffs constantly asked Cedric to provide financial records and statements so that they could understand the state of the Bistro and Bakery. Cedric stonewalled Plaintiffs at every turn with excuse after excuse for why the Bistro and Bakery's books and records were not maintained, available, and accurate.

66.     When confronted about his failure to maintain the Bistro and Bakery's books and records, Cedric frantically prepared a profit and loss statement. The profit and loss statement was wildly inaccurate and materially false, inflating certain expenses to make it seem as though the Bistro and Bakery was losing money.

67.     In truth, the Bistro and Bakery lost money because Cedric had misappropriated hundreds of thousands of dollars. Cedric falsified the Bistro and Bakery's books and records and prepared materially false financial statements in order to conceal the funds that he funneled out of the Bistro and Bakery to himself.

LEGAL\113856856\3

68. Cedric instructed the Bistro and Bakery's bookkeeper make fraudulent entries to conceal the embezzled funds, including numerous false adjustments to make the numbers "look good."

69. Cedric also told the bookkeeper to falsely record payments so that Cedric would not have to pay taxes on them.

70. And Cedric told the bookkeeper to produce financial documents "with no Amalfi dues."

71. For example, on March 10, 2025, Cedric sent the Bistro and Bakery's bookkeeper a balance sheet with the $500 checks to himself and Estelle crossed out.

72. The same day, Cedric wrote to the Bistro and Bakery's bookkeeper: "I AM NOT IN CONTROL OF ANYTHING BESIDE TO MAKE SURE BBB IS ACCURATE AND I FAILED ON MY END."

73. On March 25, 2025, Cedric wrote to the Bistro and Bakery's bookkeeper: "did you adjusted the bakery coffee shop invoice so it all line up?"

74. On March 29, 2025, Cedric wrote to the Bistro and Bakery's bookkeeper: "Estelle draw check atached [sic] also remove quickbooks the 500 that are showing."

### 3. Cedric and Estelle's Misappropriation of the Bistro and Bakery's Resources to Open Their Competing Business

75. In or around early 2023, Cedric began discussions with the Southern Market in Lancaster—a food hall located 150 yards away from the Bistro and Bakery—about him and Estelle opening a new eatery.

76. On or about March 21, 2023, Cedric and Estelle created Barberet, LLC to conduct their personal business ventures, including, but not limited to, their new food business at the Southern Market.

LEGAL\113856856\3

77.      Upon information and belief, Cedric and Estelle capitalized Barberet, LLC using funds misappropriated from the Bistro and Bakery.

78.      Upon information and belief, Cedric signed a Food Hall Vendor Agreement with the Southern Market to open their new food business.

79.      In or around January 2025, Cedric and Estelle opened a bakery stand just blocks from the Bistro and Bakery in Lancaster.

80.      Cedric used Bistro and Bakery resources to establish and operate the bakery stand.

81.      Cedric and Estelle prepared pastries and other items that they sold at their bakery stand using Bistro and Bakery equipment, ingredients, and supplies.

82.      Cedric and Estelle stocked the bakery stand using Bistro and Bakery equipment, ingredients, and supplies.

83.      Cedric and Estelle sold identical food items at their bakery stand that they sold at the Bistro and Bakery.

84.      Cedric and Estelle used Bistro and Bakery funds to pay for their bakery stand's expenses, including, at minimum, the bakery stand's equipment and supplies.

85.      Cedric directed Bistro and Bakery employees to bake and prepare items for sale at the bakery stand, while Orsini paid those employees' wages.

86.      Cedric and Estelle did not ask Plaintiffs for permission to open the bakery stand.

87.      Cedric and Estelle kept the money they made from the bakery stand for themselves.

88.      Cedric and Estelle sold identical items in their bakery stand sold in Bistro and Bakery.

12

89.     Cedric and Estelle operated their bakery stand using resources they took, without permission, from the Bistro and Bakery, including, but not limited to, money, supplies, and equipment.

90.     Upon information and belief, Cedric used Bistro and Bakery accounts, without permission, to purchase supplies and equipment for his bakery stand.

### 4.     Cedric's Attempts to Cover His Tracks

91.     Once Cedric realized that Plaintiffs would discover he had misappropriated significant amounts of Bistro and Bakery funds and resources for personal purposes, he began transferring money back into the Bistro and Bakery in an attempt to conceal his theft.

92.     On or around March 4, 2025, Barberet, LLC transferred approximately $2,000 into a Bistro and Bakery account.

93.     On March 6, 2025, Plaintiffs, through counsel, sent Cedric a letter informing him of his breaches of the Operating Agreement and financial impropriety. Plaintiffs demanded that Cedric cease his unauthorized financial practices, cure his breaches under the Operating Agreement, and reimburse Orsini for the misappropriated funds.

94.     On or around March 7, 2025, Cedric deposited $10,000 into a Bistro and Bakery account.

95.     While Plaintiffs' investigation is ongoing, upon information and belief, Cedric funneled Bistro and Bakery funds to his personal accounts and Barberet, LLC to establish and run his bakery stand and fund numerous other personal ventures at the expense of Plaintiffs and the employees of the Bistro and Bakery.

### C.     **Cedric's Expulsion from Orsini and Termination of Estelle**

96.     Cedric responded, through counsel, to Plaintiffs' March 6 letter on March 14, 2025. In his March 14, 2025 letter, Cedric acknowledged that he had violated the Operating Agreement

13

in multiple ways. But instead of curing his breaches, Cedric announced that he had no intention of changing his financial practices or making Plaintiffs whole for the funds he misappropriated. Cedric instead claimed that he did not need to abide by the Operating Agreement and offered baseless excuses for his clear misappropriation of Bistro and Bakery funds.

97. On March 14, 2025, Plaintiffs, through counsel, sent Cedric another letter refuting his plainly incorrect understanding of his duties to Orsini, to the Members, and under the Operating Agreement. Plaintiffs further put Cedric on notice that his engagement with his bakery stand violated his duties under Section 11.2 of the Operating Agreement and demanded that Cedric cease his engagement with his bakery stand immediately.

98. On March 21, 2025, Cedric responded, through counsel, to Plaintiffs' letter of March 14, 2025. Cedric announced that he refused to cease his engagement with the bakery stand.

99. Based on Cedric's refusal to cure his material breaches of the Operating Agreement and account for his misappropriation of Bistro and Bakery funds, the Managers determined that there existed grounds to expel Cedric from Orsini for cause under Section 7.7(b) of the Operating Agreement.

100. On March 27, 2025, upon recommendation of the Managers, the Members expelled Cedric from Orsini. The Managers also terminated Estelle from the Bistro and Bakery.

101. Following his for-cause expulsion, upon information and belief, Cedric has attempted to extract revenge by deleting emails (some of which contained important orders) and changing passwords to prevent Orsini employees from accessing point-of-sale software and other business accounts, among other acts, which are still being discovered.

102. Following her termination, Estelle wiped her emails from her Bakery and Bistro email account.

14

**D.      Plaintiffs' Common Pleas Lawsuit Against Cedric and Estelle**

103.    Plaintiffs sued Cedric on April 8, 2025, in the Lancaster County Court of Common Pleas, in a case captioned *The Orsini Group, et al. v. Cedric Barberet, et al.*, No. CI-25-02610 (Lancaster County Com. Pl.) (the "Common Pleas Lawsuit").

104.    Plaintiffs obtained a preliminary injunction against Cedric on June 23, 2025, prohibiting him from operating his bakery stand.

105.    Plaintiffs subsequently filed an amended and second amended complaint, adding as Defendants Estelle and their business Barberet, LLC.

106.    The Court of Common Pleas sustained in part and overruled in part Estelle's preliminary objections to certain claims.

107.    The pending claims in the Court of Common Pleas lawsuit are: claims for conversion against Cedric and Barberet, LLC; claims for breach of fiduciary duty against Cedric and Estelle; claims for breach of contract against Cedric; claims for usurpation of a corporate opportunity against Cedric and Barberet, LLC; claims for aiding and abetting against Barberet, LLC; claims for unjust enrichment against Cedric and Barberet, LLC; and a claim for injunctive relief against Cedric.

108.    Plaintiffs served requests for admissions on Cedric asking him to admit the dates and amounts of three hundred and seventy (370) fraudulent checks he wrote himself from Orsini's bank account.

109.    Cedric responded: "As the Defendant is not in possession of the checks referenced in this Request for Admission, he can neither admit nor deny the Request. If Plaintiffs produce the 370 checks, Mr. Barberet may be able to better respond to this Request for Admission."

15

LEGAL\113856856\3

110. Plaintiffs also served requested bank statements and other financial records related to the misappropriated funds.

111. Despite the lawsuit centering on financial misappropriation, Cedric refused to produce the requested records. Cedric produced no records of the numerous checks he fraudulently wrote himself and Estelle from Orsini's bank account.

112. Instead, Cedric and Estelle sought to block discovery of the misappropriated funds by resorting to bankruptcy.

113. Despite embezzling hundreds of thousands of dollars from the Bistro and Bakery, Cedric and Estelle claimed to be insolvent, purportedly justifying the protection of the bankruptcy process.

114. On November 26, 2025, Defendants filed a suggestion of bankruptcy with the Court of Common Pleas.

115. On December 15, 2025, the Court of Common Pleas stayed the Common Pleas Lawsuit pending the outcome of the instant bankruptcy petition.

116. Plaintiffs are not aware of any bankruptcy filing on the part of Barberet, LLC. Nevertheless, the entire Common Pleas Lawsuit has been stayed, and Plaintiffs understand that to include the claims against Barberet, LLC.

E. **Debtors' Inaccurate Income Disclosures**

117. Cedric and Estelle's 2024 income as reported in their bankruptcy filings is significantly lower than total value of checks they cashed from Orsini's bank account.

118. In 2024, Cedric cashed $86,200 worth of checks from Orsini's bank account. But Debtors' form 107, at D.I. 23, reports Cedric's 2024 income as $75,000.

LEGAL\113856856\3

119.    In 2024, Estelle cashed $80,100.00 worth of checks from Orsini's bank account. But Debtors' form 107 report's Estelle's 2024 income as $77,500.

120.    In 2023, Estelle cashed $69,150 worth of checks from Orsini's bank account. But Debtors' form 107 reports Estelle's 2023 income as $53,650.

121.    None of Debtors' disclosures included the cash sales that went missing from the Bistro and Bakery and were never accounted for.

122.    None of Debtors' disclosures included the luxury goods purchased with Orsini's credit card.

### COUNT I: DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(A)(2)(A)—FRAUD

123.    Plaintiffs repeat and re-allege paragraphs 1-122 as if set forth at length herein.

124.    While a member of Orsini, Cedric engaged in numerous acts of fraud to obtain money and property that rightfully belonged to Plaintiffs, including but not limited to:

    a.    Presenting checks to be drawn on Orsini's bank account while knowing that Orsini had not authorized the payments.

    b.    Presenting Orsini's credit card as payment for personal items while knowing that Orsini had not authorized the payments.

    c.    Instructing employees of the Bistro and Bakery to prepare food to be served at Cedric and Estelle's unlawful bakery stand, knowing that Orsini would not receive the proceeds from those sales.

    d.    Concealing fraudulent checks by telling Plaintiff Benjamin Frank they were written to replenish petty cash paid to employees as tips, when Cedric knew this was not true.

LEGAL\113856856\3

e. Preparing false profit and loss statements for Plaintiff Benjamin Frank to conceal that money had been stolen from the business.

f. Deleting emails and changing passwords on the Bistro and Bakery's computer systems to prevent Plaintiffs' discovery of the full extent of the loss.

125. Estelle also received money from checks Cedric fraudulently wrote against Orsini's bank account.

126. On information and belief, Estelle received items Cedric fraudulently purchased with Orsini's credit card and luxury items Cedric fraudulently accepted as payment for the Bistro and Bakery.

127. Estelle also deleted all her emails from the Bistro and Bakery email system upon her termination.

128. Accordingly, debts based on the conduct alleged herein, which are based upon monies Cedric and Estelle obtained by "false pretenses, a false representation, or actual fraud," are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### COUNT II: DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(A)(4)—DEFALCATION, EMBEZZLEMENT, AND LARCENY

129. Plaintiffs repeat and re-allege paragraphs 1-122 as if set forth at length herein.

130. From 2014 until his expulsion on March 27, 2025, Cedric was a member of Orsini, a Pennsylvania LLC.

131. Members of Pennsylvania LLCs owe fiduciary duties to the LLC and other members. *Hayes v. Goring*, No. 2228 EDA 2024, 2025 WL 2953794, at *4 (Pa. Super. Ct. Oct. 20, 2025).

18

132.    During the time that Cedric was a member of Orsini, he committed numerous acts of defalcation, embezzlement, and/or larceny, including but not limited to the following:

    a.    Pocketing cash sales from the Bistro and Bakery, which proceeds were the property of Orsini and only temporarily entrusted to Cedric for the limited purpose of depositing them in Orsini's bank accounts.

    b.    Writing himself and Estelle hundreds of unauthorized checks from Orsini's bank account, thereby taking money belonging to Orsini.

    c.    Accepting and then keeping for himself luxury gifts in lieu of payment for the Bistro and Bakery, which gifts were the property of Orsini because they were received as payment for the Bistro and Bakery's products.

    d.    Using the company credit card for personal purchases, thereby embezzling or stealing the Orsini's credit and the funds used to pay the credit card bill.

    e.    Using Bistro and Bakery funds for personal legal bills, thereby embezzling and stealing the funds.

    f.    Converting Bistro and Bakery resources, equipment, and labor to his own personal use to start an unlawful competing business, while owing a duty not to compete with the Bistro and Bakery, thereby committing defalcation while acting as a fiduciary to Plaintiffs and embezzling Orsini resources that had been temporarily entrusted to him for the limited purpose of running the Bistro and Bakery.

133.    Cedric was not entitled to any of these funds or resources and had no right to take them from Orsini.

LEGAL\113856856\3

134. Rather, these funds were temporarily entrusted to Cedric by virtue of his fiduciary relationship with Plaintiffs, for the limited purpose of disposing of them for Plaintiffs' benefit.

135. Instead, Cedric defalcated, embezzled, and/or stole these funds by taking them for his own purposes.

136. From 2014 until her termination on March 27, 2025, Estelle was an employee of Orsini, where she served as manager of the Bistro and Bakery.

137. Estelle also received money from Plaintiffs to which she was not entitled. On information and belief, Estelle knew she was not entitled to this money because it was not part of her regular salary.

138. On information and belief, Estelle received luxury gifts misappropriated by Cedric to which she knew she was not entitled.

139. For example, after Cedric used Orsini's credit card to purchase airline tickets to Cancún, a Facebook post shows Estelle with Cedric in the airport waiting for the flight.

140. Estelle also converted Bistro and Bakery resources, equipment, and labor to her own personal use to start her and Cedric's competing business.

141. As the Court of Common Pleas determined in overruling Estelle's preliminary objection to Plaintiffs' claim for breach of fiduciary duty, "taking these items, or allowing the items to be taken, from [Estelle's] employer would constitute a misappropriation of her employer's product" and "could constitute a breach of her fiduciary duty to her employer."

142. As a result of Cedric and Estelle's misappropriation of funds and resources, Plaintiffs have been damaged in amounts of at least several hundred thousand dollars.

LEGAL\113856856\3

143.    Moreover, Plaintiffs' investigation into Cerdic and Estelle's misappropriation of Bistro and Bakery funds and resources is ongoing and may reveal additional sums for which Cedric and Estelle are indebted to Plaintiffs.

144.    Accordingly, debts based on the conduct alleged herein, which are based upon monies Cedric and Estelle obtained by fraud and defalcation while acting as fiduciaries of Plaintiffs, embezzlement, and larceny, are non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

### COUNT III: DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(A)(6)

145.    Plaintiffs repeat and re-allege paragraphs 1-122 as if set forth at length herein.

146.    While a member of Orsini, Cedric wrote unauthorized checks to himself and Estelle from Orsini's bank account, used the Bistro and Bakery credit card for personal purchases, accepted luxury gifts to himself in lieu of payment to the Bistro and Bakery, used Bistro and Bakery funds to pay his personal legal bills, and misappropriated Bistro and Bakery supplies, labor, equipment, and resources for his and Estelle's unlawfully competing business.

147.    Cedric took these acts knowing to a substantial certainty that they would deprive Plaintiffs of the money took, the payments diverted, and the resources misappropriated. Indeed, that was the entire point—to divert these funds from Plaintiffs to Cedric and Estelle.

148.    On information and belief, Estelle accepted checks drawn on Orsini's bank account and items purchased with the Bistro and Bakery credit card knowing to a substantial certainty that doing so would deprive Plaintiffs of this property.

149.    Estelle also used Bistro and Bakery supplies, equipment, and labor for the unlawfully competing bakery stand, knowing to a substantial certainty that her actions would deprive Plaintiffs of these items.

LEGAL\113856856\3

150. The foregoing actions damaged Plaintiffs in the amount of at least several hundred thousand dollars.

151. For these reasons, debts based on the conduct described herein, which are based on the "willful and malicious injury" to Plaintiffs' property, are not dischargeable pursuant to 11 U.S.C. § 523(a)(6).

### COUNT III: DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 727(A)(3)—DESTRUCTION OF OR FAILURE TO KEEP RECORDS

152. Plaintiffs repeat and re-allege paragraphs 1-122 as if set forth at length herein.

153. Despite having a duty to do so under the Operating Agreement, Cedric routinely failed to maintain the Bistro and Bakery's books and records, including preparation of regular, accurate financial statements.

154. Since in or around January 2024, Cedric failed to prepare bank reconciliation statements comparing the Bistro and Bakery's internal cash records with bank statements.

155. Cedric never maintained proper records for Bistro and Bakery cash funds and tips despite repeated demands that he do so.

156. When Cedric finally did prepare a profit and loss statement, it was wildly inaccurate and materially false, inflating certain expenses to make it seem as though the Bistro and Bakery was losing money, so as to cover up that the Bistro and Bakery lost money because Cedric had misappropriated hundreds of thousands of dollars.

157. Cedric instructed the Bistro and Bakery's bookkeeper make fraudulent entries to conceal the embezzled funds, including numerous false adjustments to make the numbers "look good."

158. Cedric also told the bookkeeper to falsely record payments so that Cedric would not have to pay taxes on them.

22

LEGAL\113856856\3

159. Cedric falsified Orsini books and records and prepared materially false financial statements in order to conceal the funds that he funneled out of the Bistro and Bakery to himself.

160. Cedric changed passwords and deleted emails to prevent Orsini employees from accessing point-of-sale software and other business accounts.

161. Estelle deleted her emails from their Bakery and Bistro email accounts upon her termination.

162. When Plaintiffs sued Cedric and Estelle and asked Cedric to admit to the hundreds of checks he wrote himself from Orsini's bank account, he responded that he was "not in possession of the checks referenced" and "c[ould] neither admit nor deny" that he received them.

163. Cedric failed to prepare financial documents showing how hundreds of thousands of dollars in cash sales to the Bistro and Bakery were never deposited in its bank account.

164. Cedric also refused to produce bank statements and other financial information in discovery in the Common Pleas Lawsuit.

165. Despite embezzling hundreds of thousands of dollars from Plaintiffs, Cedric and Estelle's bankruptcy filings purport to show them as insolvent with just over $20,000 in cash.

166. Cedric and Estelle's bankruptcy filings contain no explanation for what happened to the hundreds of thousands of dollars in embezzled cash receipts, fraudulent checks, and luxury gifts.

167. In particular, Cedric and Estelle's 2024 income as reported in their bankruptcy filings is significantly lower than total value of checks they cashed from Orsini's bank account.

168. In 2024, Cedric cashed $86,200 worth of checks from Orsini's bank account. But Debtors' form 107, at D.I. 23, reports Cedric's 2024 income as $75,000.

LEGAL\113856856\3

169. In 2024, Estelle cashed $80,100.00 worth of checks from Orsini's bank account. But Debtors' form 107 report's Estelle's 2024 income as $77,500.

170. In 2023, Estelle cashed $69,150 worth of checks from Orsini's bank account. But Debtors' form 107 reports Estelle's 2023 income as $53,650.

171. Unless these numbers are intentionally false, Debtors must have failed to keep records of the checks they cashed from Orsini's bank account. Indeed, Cedric's discovery responses in the Common Pleas Lawsuit essentially admit that he failed to do so.

172. The discrepancies in Debtors' financial disclosure are even larger when considering the hundreds of thousands of dollars in cash sales that went missing from the Bistro and Bakery and have never been accounted for.

173. Debtors' filings also fail to explain the insolvency of Barberet, LLC. A September 2025 balance sheet shows its largest liability as "tips payable." But Debtors' Schedule A/B, D.I. 14, p. 9, merely describes Barberet, LLC as "Not operating - Estimated liabilities exceed assets," and does not clarify whether the individuals owed those tips were any other than Cedric and Estelle themselves.

174. Accordingly, Cedric and Estelle have concealed, destroyed, mutilated, falsified, and/or failed to keep or preserve records from which their financial condition or business tractions might be ascertained.

175. There is no justification for the foregoing conduct, given Debtors' deliberate theft of Plaintiffs' property.

176. For these reasons, Debtors are not entitled to a discharged under 11 U.S.C. § 727(a)(3).

LEGAL\113856856\3

## COUNT III: DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 727(A)(4)(A)—FALSE ACCOUNT

177.    Plaintiffs repeat and re-allege paragraphs 1-122 as if set forth at length herein.

178.    Cedric and Estelle's 2024 income as reported in their bankruptcy filings is significantly lower than total value of checks they cashed from Orsini's bank account.

179.    In 2024, Cedric cashed $86,200 worth of checks from Orsini's bank account. But Debtors' form 107, at D.I. 23, reports Cedric's 2024 income as $75,000.

180.    In 2024, Estelle cashed $80,100.00 worth of checks from Orsini's bank account. But Debtors' form 107 report's Estelle's 2024 income as $77,500.

181.    In 2023, Estelle cashed $69,150 worth of checks from Orsini's bank account. But Debtors' form 107 reports Estelle's 2023 income as $53,650.

182.    In addition, none of Debtors' financial disclosures account for the hundreds of thousands of dollars in cash sales that went missing from the Bistro and Bakery and have never been accounted for.

183.    Because Debtors report receiving less in income than they were paid themselves from the Bistro and Bakery, these accounts are false.

184.    On information and belief, Debtors knew these numbers to be false because they knew the value of checks they themselves cashed from Orsini's bank account.

185.    For these reasons, Debtors are not entitled to a discharged under 11 U.S.C. § 727(a)(4)(A).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Debtors as follows:

25

LEGAL\113856856\3

a.    Declaring that any debt based on or arising out of the conduct described here, including the claims asserted by Plaintiffs against Debtors in the Lancaster County Court of Common Pleas, are non-dischargeable debts pursuant to 11 U.S.C. § 523(a)(2), (4), and (6);

b.    Declaring that Debtors are not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3) and (4)(A); and

c.    Granting Plaintiffs any other and further relief as the Court deems just and proper.

**COZEN O'CONNOR P.C.**

Date:    March 6, 2026

By: */s/ John T. Carroll, III*
John T. Carroll, III
(PA Bar No. 34243)
Matthew A. Glazer, Esq.
(PA Bar No. 204540)
Jason A. Kurtyka, Esq.
(PA Bar No. 325995)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
T: (215) 665-2000
jcarroll@cozen.com
mglazer@cozen.com
jkurtyk@cozen.com

*Attorneys for Plaintiffs The Orsini Group, LLC, Benjamin T. Frank, and Amalfi Properties LP*

LEGAL\113856856\3